| | |
|---|---|
| **ANDRA C. CRABTREE (deceased)** ) | |
| **By: Kenneth A. Crabtree,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL NO. 4:05cv76-AS-PRC** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Andra C. Crabtree (deceased), by her husband Kenneth Crabtree, seeks judicial review of the denial of benefits under Title II of the Social Security Act. The Commissioner of Social Security found that Andra C. Crabtree was not disabled and not entitled to Disability Insurance Benefits ("DIB") under 42 U.S.C. §§ 416(I), 423.

Andra C. Crabtree ("Mrs. Crabtree") applied for DIB on January 17, 2002, claiming a disability onset date of December 12, 2001. Her initial claim and request for reconsideration were denied. Mrs. Crabtree then requested a hearing in front of an Administrative Law Judge ("ALJ"), which was conducted by ALJ Peter C. Americanos on June 3, 2003. ALJ Peter Americanos issued an opinion dated August 8, 2003, finding that despite the limitations caused by Mrs. Crabtree's impairments, she could still perform sedentary work, including her past relevant work as a bookkeeper. Mrs. Crabtree filed a request for review, and by a decision dated August 19, 2005, the Appeals Council upheld the ALJ's decision, making it the final decision of the Commissioner. Mrs. Crabtree passed away November 16, 2004 of cardiopulmonary arrest. Thereafter, the case was filed by her husband in this Court on October 12, 2005, remanded back

to the Commissioner on December 12, 2005, pursuant to 42 U.S.C. § 405(g), and reinstated on July 19, 2007. Jurisdiction is conferred upon this Court pursuant to 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Mrs. Crabtree was thirty-six years old with a high school education at the onset of her alleged disability on December 12, 2001. She was thirty-seven years old when the ALJ issued his decision. Prior to her disability, Mrs. Crabtree worked as a field rep/field contractor, nursing home field controller, administrative assistant, bookkeeper/accounts receivable, and business office manager (Tr. 114).

Mrs. Crabtree had three primary treating physicians. Her family doctor and primary care physician was Dr. Douglas, who treated her since 1995. Prior to Mrs. Crabtree's death in 2004, she was treated for pain since 2000 by Dr. Bigler, a pain specialist, and she was treated by Dr. Singh, her psychiatrist, since 2002. The reports of the three doctors state that Mrs. Crabtree met or equaled impairments listed in 12.04(A)/12.04(B),[1] 14.06,[2] and/or 1.04(A)[3]. Specifically, Mrs. Crabtree was diagnosed with several medical conditions and alleged that she became disabled due to limitations caused by the following: degenerative disc disease, a herniated disc and chronic low back pain, fibromyalgia, depression, asthma, arthritis, chronic sinusitis, anemia, morbid obesity, edema, and dizziness/drowsiness and vision problems as side effects from her twenty-plus medications (Tr. 49, 220, 371-73, 442-44, 590-599).

---

[1]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00, Mental Disorders.

[2]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.00, Immune System Disorders.

[3]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00, Musculoskeletal System.

<u>Medical Evidence</u>

As Mrs. Crabtree's family physician, Dr. Douglas treated her for edema, chronic low back pain, lumbar radiculopathy, fibromyalgia, depression, asthma, and morbid obesity (Tr. 253). On January 20, 2000, Dr. Douglas referred Mrs. Crabtree for physical therapy and a TENS unit for her pain (Tr. 343-44, 423-24).

Dr. Bigler, an anesthesiologist, first saw Mrs. Crabtree in February 2000 after an MRI taken in August 1999 revealed a slightly anterior L5-S1 spondylolisthesis, moderate compression of the left L5 nerve root, mild degenerative disc disease at L3-4 and L4-5, and a possible pars defect at the L5-S1 levels (Tr. 299-300). Dr. Bigler treated Mrs. Crabtree for her chronic low back pain, degenerative disc disease, and lumbar radiculopathy. At this time, Mrs. Crabtree rated her back pain as 5-6/10 (Tr. 300), and Dr. Bigler recorded that Mrs. Crabrtree's gait and station were normal, range of motion was good, knee reflexes were absent, but Achilles reflexes were normal, straight leg raise was negative, and sensation and strength were normal, with no significant anxiety or depression noted (Tr. 300-01). Dr. Bigler proceeded to treat Mrs. Crabtree with epidural steroid injections, and in January and August 2001, Dr. Bigler noted Mrs. Crabtree's continuing diffuse lower back pain and tenderness, for which he administered lumbar injections every few months (Tr. 278-81, 309-23, 346-51, 433, 435-36, 468, 472).

In November of 2001, Dr. Crecelius, a neurologist, performed a consultative examination on Mrs. Crabtree and reported that her chest was clear, her extremities were without edema, her muscle power was 5/5, and her sensation was intact, but her ankle and knee reflexes were absent (Tr. 297). Plain films showed minimal spondylolisthesis at L5-S1, and an MRI showed a pars defect with compression of the left L5 root laterally, and a right paramedian herniation with no

real right S1 compression (Tr. 297, 298, 434). Dr. Crecelius recommended aggressive medical management of her weight to help her condition (Tr. 297).

In February 2002, Mrs. Crabtree complained of lower left pain resulting in her inability to walk, and her examination revealed lower back tenderness made worse by flexion and extension (Tr. 255). On March 6, 2002, Mrs. Crabtree was treated in the emergency room for pneumonia (Tr. 244-47).

Dr. Bangura conducted a consultative examination of Mrs. Crabtree's physical condition on March 9, 2002 (Tr. 285-89). Dr. Bangura's assessment of Mrs. Crabtree was that she was alert and oriented with her motor strength being a 5/5 in all muscle groups tested. Mrs. Crabtree's gait and station, sensory exam, and deep tendon reflexes were normal. Mrs. Crabtree was able to get on and off the examination table without difficulty, able to walk on her heels and toes without difficulty, and she was able to squat and bend all the way over and get back up without difficulty. Dr. Bangura also found her straight leg raising to be negative, and her hand grip and fine finger movements were normal (Tr. 287). Dr. Bangura determined that Mrs. Crabtree's aliments included lumbar sacral pain at L5-SI, with a history of degenerative joint disease and herniated disc in that area, a history of fibromyalgia, asthma, bronchitis, and morbid obesity (in that she weighed 335 pounds) (Tr. 286). Dr. Bangura recommended a follow-up regarding Mrs. Crabtree's pneumonia and wheezing, and MRI of the lumbosacral area, and a mini-mental status exam (Tr. 288). Mrs. Crabtree filed a complaint against Dr. Bangura, because she was dissatisfied with her examination, claiming that Dr. Bangura never performed a proper exam and then reported inaccurate findings (Tr. 99-106, 199-206, 524-27).

Also in March of 2002, Dr. Buonanno performed a consultative psychiatric examination, and drafted a report based on his review of Dr. Singh's records and based on Dr. Buonanno's

own consultative exam. Mrs. Crabtree reported that she was depressed because of her chronic illness, unemployment, financial impacts, and pessimistic prognosis, and Dr. Buonanno diagnosed Mrs. Crabtree with adjustment disorder with depressed mood and assigned a GAF score of 49 (Tr. 291-292).

Dr. Bigler submitted a letter dated July 9, 2002 which stated his impression that Mrs. Crabtree was totally disabled on account of her pain (Tr. 254).

During a consultative psychiatric examination on August 5, 2002, Dr. Singh noted that Mrs. Crabtree had good eye contact, normal speech, a linear and logical thought process, fair insight, good judgment, and found that her attention, concentration, and memory were within normal limits (Tr. 421). Mrs. Crabtree's mood was sad and anxious, thus Dr. Singh diagnosed her with major depression, recurrent, mild intensity, assigned her a Global Assessment of Functioning ("GAF") score of 55, and adjusted her medications (Tr. 421-422).

Upon the Social Security Administration's request, Dr. Douglas provided a statement from August 7, 2002 and a written report dated June 19, 2002 revealing that he felt Mrs. Crabtree met or exceeded the definition of disability based on a combination of diagnoses including fibromyalgia, chronic low back pain, and morbid obesity, and that she was unable to lift beyond ten pounds, unable to perform most postural maneuvers, and she could stand/walk less than 2 hours in an 8-hour work day and sit less than 6 hours in an 8-hour work day (Tr. 249-53). He noted that she may not climb, stoop, bend, or twist, and her fatigue and pain require frequent breaks. She had numerous environmental limitations due to her asthma and fibromyalgia, including the need to avoid dust, vibration, humidity/wetness, hazards (machinery/heights), and fumes/odors/chemicals/gases (Tr. 252). He noted that her depression and asthma appeared under good control (Tr 253). Dr. Douglas's office notes repeatedly

reference depression, complaints of pain, and fibromyalgia without any actual clinical documentation of trigger points or other diagnostic assessment for fibromyalgia.

After recommending bariatric surgery for Mrs. Crabtree in March 2003, in a letter dated April 22, 2003, Dr. Bigler remarked that Mrs. Crabtree's chronic symptoms, including pain, satisfied the impairments listed in 1.04(A), but noted that her straight let raise had "for the most part" been negative (Tr. 385-86). He also stated that in an 8 hour workday, Mrs. Crabtree could sit/stand/walk for 5-10 minutes for a total of 30 minutes, could occasionally lift up to 10 pounds (carrying up to 5 pounds for 10% of the workday and 6-10 pounds for 5% of the workday), and would have difficulty standing or sitting for any prolonged period of time (Tr. 386-87). Dr. Bigler reported that Mrs. Crabtree cannot use both hands for pushing and pulling arm control, or use either foot for pushing and pulling leg control. She could reach for close objects for 5% of the workday, but increased activity other than this would be difficult. Dr. Bigler recommended that she have no exposure to unprotected heights or moving machinery, nor could she drive or ride in automotive equipment, and recommended that she have only occasional exposure to marked changes in temperature, humidity, dust fumes and gases due to her asthma (Tr. 386-387, 475). Dr. Bigler concluded that Mrs. Crabtree would qualify for totally disabled since December 18, 2001 (Tr. 387). Dr. Bigler supplemented his 2003 letter on January 13, 2004, again attesting to his belief that the severity of Mrs. Crabtree's medical problems are definitely the equivalent to the impairments listed in 1.04(A) (Tr. 529-30).

In a letter to Mrs. Crabtree's attorney dated May 14, 2003, Dr. Douglas disagreed with the State Agency reviewing physicians' opinions and opined that Mrs. Crabtree was disabled since December of 2001 (Tr. 475). Dr. Douglas believed Mrs. Crabtree suffered from reactive depression, and stated that she would qualify as disabled under section 1.04(A), due to chronic

low back pain and radicular symptoms, and would also meet the criteria in section 14.06, based on conditions such as fibromyalgia. *Id*. Dr. Douglas concluded that Mrs. Crabtree's functional capacity allowed her to stand less than two hours and sit less than two hours, she had limited use of her upper and lower extremities due to chronic lower back pain and fibromyalgia, and she could not kneel, climb, crouch, or crawl. *Id*. He recommended that she avoid exposure to machinery, heights, humidity, and wetness or respiratory irritants due to her asthma. *Id*.

In a letter dated June 3, 2003, Dr. Singh stated that Mrs. Crabtree's symptoms have caused her to be totally disabled since December of 2001, and that while she does not specifically meet any listing, Dr. Singh believed that her symptoms would be equivalent to meeting the impairments listed in 12.04(A) and 12.04(B) (Tr. 477-78). He noted Mrs. Crabtree's marked restriction of daily living activities and maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decomposition. *Id*.

Review by State Agency

Doctors Kladder and Neville, reviewing psychologists for the State Agency, opined in May and September 2002, respectively, that Mrs. Crabtree did not have a severe mental impairment because her adjustment disorder with depressed mood caused only mild limitation in her daily living activities (Tr. 229-32, 264-77).

Doctors Wenzler and Crawford, reviewing physicians for the State Agency, opined in May and August 2002, respectively, that Mrs. Crabtree could perform a limited range of light work despite the limitations caused by her impairments (Tr.234-42).

<u>Vocational Specialist</u>

In contrast, vocational rehabilitation specialist, Mr. Blankenship, who has testified at Social Security hearings over two hundred times a year, disagreed. Mr. Blankenship drafted a letter dated May 28, 2003 to Mrs. Crabtree's attorney, after holding a personal interview with Mrs. Crabtree on that same day, and relying on the June 2002 letter from Dr. Douglas and the July 2002 letter from Dr. Bigler (Tr. 447-49). Mr. Blankenship, while not conducting tests of his own, was of the opinion that Mrs. Crabtree could not perform the sitting, standing, walking, lifting, and carrying aspects necessary to participate in the workforce (Tr. 448). Mr. Blankenship reported that Mrs. Crabtree requires a walker for mobility and she acknowledged that she is "unable to walk through her home without some type of assistive device" (Tr. 447). Mr. Blankenship was of the opinion that based on Mrs. Crabtree's assertions and information provided by Dr. Douglas and Dr. Bigler, Mrs. Crabtree's medical conditions appeared to meet the level of severity required for disability (Tr. 448).

<u>Hearing Testimony</u>

At the administrative hearing the impartial vocational expert ("VE"), Mr. Thomas Roundtree testified. Mr. Roundtree testified that a hypothetical individual with Mrs. Crabtree's similar limitations could perform as an administrative assistant, accounting supervisor, bookkeeper, and business office manager—jobs previously held by Mrs. Crabtree (Tr. 116). The individual could also perform Mrs. Crabtree's past work as a field representative/field contractor as it was generally performed in the national economy, but not as Mrs. Crabtree performed it (Tr. 116-17). Further, if the hypothetical individual was also limited to no more than superficial interaction with the general public, coworkers, and supervisors, they could not perform Mrs. Crabtee's past work as a field representative/field contractor, business office manager,

accounting supervisor, or administrative assistant, but they could perform her past work as a bookkeeper (Tr. 117-18).

Dr. Hutson, a board-certified orthopedic surgeon, testified at the hearing as the medical expert ("ME"), and opined that Mrs. Crabtree did not meet impairments listed in the social security regulations (Tr. 106-123). Dr. Hutson totally disagreed with Dr. Bigler's opinion that Mrs. Crabtree met the impairments listed in 1.04(A), because Mrs. Crabtree did not have the loss of neurological function in the appropriate neurodermatomal area in the lower extremity that would meet that impairment (Tr. 111). Moreover, Dr. Hutson reviewed Mrs. Crabtree's medical records and testified that the records did not reveal documentation of the requisite number of trigger points to substantiate a diagnosis of fibromyalgia (Tr. 110). According to Dr. Hutson, from an orthopedic standpoint, Mrs. Crabtree could do sedentary work if allowed to stand up after half an hour and move around, and so long as she avoided repetitive twisting and concentrated exposure to cold, heat, wetness, humidity, vibration, heights, or dangerous machinery (Tr. 111). Dr. Hutson also testified that Mrs. Crabtree's subjective complaints were not backed up with objective findings in the record, but that if her and Mr. Crabtree's testimony is true, then Mrs. Crabtree probably could not work (Tr. 113).

Mr. and Mrs. Crabtree testified at the hearing as well (Tr. 45-123). Mrs. Crabtree stated that she stopped working due to pain, tiredness, and an inability to walk and get in and out of her vehicle (Tr. 49). Her doctor would not perform back surgery, unless she lost a substantial amount of weight (Tr. 56). She testified that she could walk about 10 feet, stand 4-5 minutes without assistance, and sit 20-30 minutes at a time (Tr. 59-59). Mrs. Crabtree struggled to lift a gallon of milk, if she could lift her arms at all, and her hands hurt every day (Tr. 59-60, 87). Mrs. Crabtree used two inhalers as needed, and took antidepressant medications because she felt

worthless, had crying spells, and did not want to be around people (Tr. 63-65, 83-84). Despite experiencing vision and double vision due to her medications, her doctors did not prohibit her from driving (Tr. 67-68), which she could not do for long periods due to problems with sitting and concentration (Tr. 50). Not only did Mrs. Crabtree occasionally drive, but she was able to occasionally clean sinks and dust-mop floors (Tr. 48, 69), but had difficulty putting on a bra, socks, or shoes. (Tr. 70-72). Mrs. Crabtree engaged in physical therapy and light exercises, and she watched television and read, but would lose her place and let her mind wander (Tr. 72-73).

Mr. Crabtree helped Mrs. Crabtree due to her physical limitations and monitored her medications (Tr. 93-96). Mr. Crabtree testified that his wife was no longer able to do many active things that she once did due to her various medical limitations, and noted that psychologically she was a "whole different person." *Id.*

ALJ's Decision

ALJ Americanos determined that Mrs. Crabtree had not engaged in substantial gainful activity since the alleged onset of disability (Step One); that while Mrs. Crabtree's asthma, vision problems, and medication side effects are not severe, her back problems, fibromyalgia, obesity, and depression (or combination thereof) are severe (Step Two); that the medically determinable impairments do not meet or medically equal one of the listed impairments in the social security regulations (Step Three); and, that given her residual functional capacity ("RFC") and considering her age, education, and past work experience, she can perform sedentary work if allowed to alternately sit and stand at will for five minutes per hour without leaving the work station, only occasionally need to squat, kneel, stoop, bend, or crawl, and be able to avoid repetitive twisting, and environments with noxious fumes, gases, respiratory irritants, temperature extremes, humidity, or vibrations, and occupational hazards (such as unprotected

heights, moving machinery, flames, or water), along with having only superficial interaction with the general public, co-workers, and supervisors—in other words, she can perform her past work as a bookkeeper (Step Four) (Tr. 19-28).

In so finding, the ALJ chose to give greater weight to the testimony of the medical expert, Dr. Hutson, over the opinions of the treating physicians, Dr. Bigler and Dr. Douglas, as to whether Mrs. Crabtree met Listing 1.04(A). The ALJ further concluded that while Dr. Douglas opined that Mrs. Crabtree's fibromyalgia met Listing 14.06, the ALJ noted that the record does not document any definitive diagnosis of the condition. The ALJ further afforded little weight to Dr. Singh's opinion that Mrs. Crabtree's depression met the criteria of Listing 12.04, because no objective evidence, including Dr. Singh's own treatment notes, demonstrated Mrs. Crabtee's marked limitations in activities of daily living, social functioning, and concentration, persistence and pace, as indicated by Dr. Singh—instead the ALJ found that she experienced only mild or moderate restrictions/difficulties in these areas. The ALJ noted that Mrs. Crabtree had not experienced any episodes of decompensation.

In addition, the ALJ gave controlling weight to Dr. Buonanno's report, in regards to Mrs. Crabtree's mental condition, and made no mention of Michael Blankenship's letter. The ALJ determined that the testimony of Mrs. Crabtree and her husband as to Mrs. Crabtree's physical limitations was exaggerated, based on the lack of medical support and based on Mrs. Crabtree's testimony as to her daily activities. Ultimately, ALJ Americanos determined that Mrs. Crabtree could perform her past work as a bookkeeper despite the limitations caused by her impairments, and thus was not disabled and not entitled to DIB.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *William v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Thus, if reasonable minds could disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## DISCUSSION

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976) (citing *Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971)). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry in determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

> (1) Whether the claimant is currently employed;
> (2) Whether the claimant has a severe impairment;
> (3) Whether the claimant's impairment meets or equals one listed by the Secretary;
> (4) Whether the claimant can perform her past work; and
> (5) Whether the claimant is capable of performing any work in the national economy.

See Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520).  The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner.  Bolinger v. Barnhart, 446 F.Supp.2d 950, 955 (N.D.Ind. 2006).

In this case, the ALJ concluded at step one of the five-step disability determination, that Mrs. Crabtree had not engaged in substantial gainful activity since the alleged onset date of her disability, December of 2001.  At step two, the ALJ concluded that Mrs. Crabtree's alleged asthma, vision problems, and side effects from medicine were not severe because they did not impose any significant limitations on her ability to perform basic work-related activities.  However, the ALJ did conclude that Mrs. Crabtree established that her back problems, fibromyalgia, obesity, and depression were severe impairments because each interfered with her ability to perform basic work activities.  At step three, the ALJ determined that Mrs. Crabtree did not have an impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing(s)").  The ALJ also

declared, for purposes of step four, that Mrs. Crabtree was able to perform her past relevant work as a bookkeeper.

**A)**     **Conflicting Medical Opinions**

Mrs. Crabtree argues that the ALJ improperly rejected the opinions of her treating physicians, Dr. Douglas, Dr. Bigler, and Dr. Singh, and failed to consider the letter by vocational specialist Mr. Blankenship.    Dr. Douglas, Dr. Bigler, and Dr. Singh, offered their treatment records, medical reports and diagnoses of Mrs. Crabtree and her medical conditions.    Their reports and diagnoses stated that she met or equaled impairments listed in 12.04(A), 12.04(B), 14.06, and/or 1.04(A).    However, the ALJ chose to rely more heavily on the opinions Dr. Bangura, a consulting physician, Dr. Hutson, the medical expert at the hearing, Dr. Crecelius, a neurologist who performed a consultative examination, Dr. Buonanno, M.D., a consultative examining psychiatrist who performed a mental status examination of Mrs. Crabtree in March 2002, and vocational expert Mr. Roundtree who testified at the hearing.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004)).    A decision to deny a physician's opinion controlling weight does not prevent the ALJ from considering it, however, and the ALJ may still look to the opinion after opting to afford it less evidentiary weight. *Elder*, 529 F.3d at 415.    Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(I)-(ii), whether the physician supported his or her opinions with sufficient explanations, *see id.* § 404.1527(d)(3), and whether the physician

specializes in the medical conditions at issue, *see id.* § 404.1527(d)(5). *Elder*, 529 F.3d at 415 (citing *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006)).

However, a claimant is not entitled to benefits simply because her physician states that she is "disabled" or unable to work, and it is the Commissioner of Social Security, not a doctor selected by the patient to treat her, who decides whether a claimant is disabled. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing *Clifford*, 227 F.3d at 870); *see also Reynolds v. Bowen*, 844 F.2d 451, 454-55 (7th Cir. 1988) ("[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability . . . .The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise . . . .Thus, while the treating physician's opinion is important, it is not the final word on a claimant's disability") (internal citation omitted)).  Thus, in the end, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992).

In determining that Mrs. Crabtree failed to meet either the criteria for Listing 1.04(A), due to chronic low back pain and radicular symptoms, or the criteria for Listing 14.06 due to fibromyalgia, the ALJ articulated several reasons for giving less weight to the treating physicians' opinions based on the record in its entirety.

First, as to the ALJ's finding that Mrs. Crabtree's back problems and pain failed to meet Listing 1.04(A), the ALJ readily noted and considered the conflicting medical opinions.  In considering the treating physicians' conclusions that Mrs. Crabtree met the Listing, he stated that

these conclusions were not supported by any specific objective clinical findings, including their own. Dr. Bigler recorded that Mrs. Crabtree's straight-leg raise had for the most part been negative. As the ALJ noted, Dr. Crecelius's neurological diagnosis of Mrs. Crabtree (just prior to her disability onset date) was a minimal spondylolisthesis at L5-S1, a pars defect with compression of the left L5 root laterally, and a right paramedian herniation with no real right S1 compression; yet, Mrs. Crabtree's muscle power was a 5/5 and her sensation was intact, although her ankle and knee reflexes were absent. The ALJ also considered Dr. Bangura's consultative assessment made shortly after the alleged disability onset date,[4] revealing that Mrs. Crabtree was experiencing lower back pain that radiated to both legs and feet with tenderness over the L5-S1; but, her motor strength, gait and station, sensory exam, and deep tendon reflexes were all normal, and she was able to walk on her heels and toes without difficulty, squat, bend all the way over and get back up, and had only a mildly diminished range of motion over the dorsolumbar spine. Mrs. Crabtree's finger movements were normal. Dr. Hutson's confirmation that there was no documented loss of neurological function in the record, and that Mrs. Crabtree's clinical examinations failed to reveal the motor loss or sensory loss required by Listing 1.04(A), provided further evidence supporting the ALJ's determination for according less weight to the treating physicians' opinions.

Second, the ALJ noted that he lent greater weight to the testimony of Dr. Hutson because not only did the record fail to document any loss of neurological function, but Dr. Hutson was

---

[4]In evaluating Dr. Bangura's report and conclusion, the ALJ considered Mrs. Crabtree's allegation that Dr. Bangura failed to perform a proper examination. The ALJ clearly explained that he found Dr. Bangura's report credible because Mrs. Crabtree lacked the qualification to determine the proper performance of an examination by a licensed physician, and because Dr. Bangura's findings were consistent with other significant evidence in the record.

board-certified in orthopedics, the medical discipline associated with the musculoskeletal listing—while Dr. Bigler and Dr. Douglas, an anesthesiologist and family practitioner, respectively, did not have this specialized expertise. S*ee* § 404.1527(d)(5).  In finding that Mrs. Crabtree's impairments did not meet Listing 1.04(A), the ALJ's decision is supported by the substantial evidence in this respect.

As to the ALJ's finding that Mrs. Crabtree did not meet the criteria for Listing 14.06 due to fibromyalgia, despite Dr. Douglas's opinion that she did, the ALJ reasonably relied on the fact that no objective findings or medical signs as required by the Listing are found in Mrs. Crabtree's medical records, including Dr. Douglas's treatment records for her.  The ALJ discussed the lack of documentation regarding Mrs. Crabtree's having any loss of neurologic function or muscle weakness, or any involvement of ocular, respiratory, cardiovascular, digestive, renal hematologic, or mental impairments related to fibromyalgia.  Mrs. Crabtree's medical records reflect no documented significant signs of severe fatigue, fever, malaise, and weight loss with at least moderate involvement by one of the body systems identified above.

In addition, despite Mrs. Crabtree's testimony that Dr. Douglas diagnosed fibromyalgia with trigger points in 2000, the ALJ noted that the record only reflects "some trigger points" in her back and arms on April 28, 2000 (Tr. 342).  In fact, Plaintiff's counsel points this Court's attention to every medical record in which fibromyalgia is mentioned, and as confirmed by Dr. Hutson and discussed by the ALJ, the record does not contain evidence of 11 or more of the 18 tender points that would cause Mrs. Crabtree to flinch and aid in diagnosing fibromyalgia.  *See Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).  In any event, Mrs. Crabtree reported to Dr. Singh, as recently as November 2002 that her fibromyalgia was under control and she was able to cope with the pain with some difficulty.  Indeed, although Mrs. Crabtree's back pain was

documented by an MRI, and despite frequent mention of fibromyalgia, the record actually contains no definitive diagnosis of this condition and Dr. Douglas never referred Mrs. Crabtree to a rheumatologist. The ALJ articulated his reasonable rejection of Dr. Douglas's opinion that Mrs. Crabtree met the Listing.

In determining that Mrs. Crabtree failed to meet the criteria for Listing 12.04(A)/12.04(B) due to depression, the ALJ assessed Mrs. Crabtree's mental impairment under the technique set forth in 20 C.F.R. § 404.1520a. *See Craft v. Astrue*, 2008 WL 3877299 *4 (7th Cir. Aug. 22, 2008). The ALJ found that Mrs. Crabtree suffered from adjustment disorder with depressed mood and from major depression, recurrent, mild intensity. Then the ALJ determined that Mrs. Crabtree suffered only mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, and gave several reasons for giving less weight to Dr. Singh's opinion that Mrs. Crabtree's depression met the criteria of Listing 12.04

In Dr. Singh's initial evaluation, he found that Mrs. Crabtree had normal attention, concentration and memory. Dr. Singh noted that her judgment was good, insight fair, but that she had major depression of mild intensity. The ALJ then considered Dr. Singh's subsequent treatment notes from August 2002 through May 6, 2003, and found them to be consistent with his initial evaluation without reflecting any aggravation of Mrs. Crabtree's condition. The ALJ also noted that the record and Dr. Singh's own treatment notes did not demonstrate any intensive psychiatric treatment, extensive psychiatric hospitalizations or profound loss of adaptive functioning—as Dr. Singh had proposed in his June 2003 report, and as Mrs. Crabtree had claimed at the hearing. The ALJ's decision was further buttressed by Dr. Buonanno's mental

18

examination of Mrs. Crabtree in March 2002 resulting in an assigned GAF score of 49, which contradicts the notion that Mrs. Crabtree experienced marked limitations in the areas of mental functioning. Even Mrs. Crabtree acknowledged that many difficulties she encountered in performing daily tasks stemmed from her physical problems, rather than from mental impairment. The ALJ's decision to discredit Dr. Singh's conclusion that Mrs. Crabtree met the Listing for depression is supported by substantial evidence.

In sum, Mrs. Crabtree's argument that the ALJ erred in rejecting the opinion of her treating physicians falls short, especially where the treatment records do not support the opinions that Mrs. Crabtree was disabled. The ALJ's weighing of conflicting medical evidence was reasonable and within his discretion as the finder of fact. This Court finds the ALJ's decision expressly articulates a well reasoned basis for rejecting the treating physicians' opinions.

It is also important to note that although the ALJ did not mention Mr. Blankenship's opinion, this does not require the court to set aside the ALJ's denial of benefits. *See Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) (reasoning that an ALJ is not required to address every piece of evidence or testimony in the record, but the ALJ's analysis must provide some glimpse into the reasoning behind the decision to deny benefits). Aside, Mr. Blankenship's letter was based on a one time interview with Mrs. Crabtree and on the reports of Dr. Douglas and Dr. Bigler, to which the ALJ expressly afforded less weight for reasons already discussed. Furthermore, the ALJ relied upon the vocational expert's assessment that Mrs. Crabtree, in light of her age, education, work experience, and residual functional capacity, could still perform the duties of a bookkeeper. ALJ Americanos discussed the evidence favoring Mrs. Crabtree's position, as well as the evidence supporting the denial of benefits, and built an accurate and

logical bridge from the evidence to the decision to afford the treating physicians' opinions less weight and deny Mrs. Crabtree benefits.

**B)** **Credibility Determination**

Mrs. Crabtree asserts that the ALJ's decision was flawed because he disregarded Mr. Crabtree's tesimony, and ignored her assertions of her physical limitations. Mrs. Crabtree asserts that this testimony was "supported by the reports of Dr. Douglas, Dr. Bigler, Dr. Singh, and the medical records." *See* Plf's Opening Brief, p. 6. This argument is unavailing.

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . .can the finding be reversed." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir.2006)). An ALJ may disregard a claimant's assertions of pain if he validly finds her incredible. *Prochaska*, 454 F.3d at 738 (citing *Carradine,* 360 F.3d at 753-54)). SSR 96-7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Prochaska*, 454 F.3d at 738. An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Id.* (citing *Scheck v. Barnhart,* 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)).

Further, a discrepancy between the degree of pain claimed by the Social Security disability applicant and that suggested by medical records is probative of exaggeration. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005). However, pain can be severe and disabling even in the absence of medical evidence *Carradine*, 360 F.3d at 753. Thus, once a claimant produces evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Id.* at 753. Instead, the ALJ must go beyond objective medical evidence in the record and consider seven factors found in the Social Security regulations in making a credibility determination including the following:

> (1) the individual's daily activity;
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
> (3) factors that precipitate and aggravate the symptoms;
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate the symptoms;
> (5) treatment other than medication the individual receives or has received for pain or other symptoms;
> (6) any measures other than treatment the individual uses or has used to relieve pain and other symptoms; and
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms

20 C.F.R. § 416.929(c)(3).

In the present case, the ALJ determined that Mrs. Crabtree exaggerated her conditions. In so finding, the ALJ rejected that Mrs. Crabtree experienced significant limitations in attention and concentration, because as discussed, Dr. Singh's treatment notes and Dr. Buonanno's report reflected just the opposite. The ALJ afforded little weight to her claims of total disability based on physical impairments because they too lacked medical support in the record, as extensively detailed above. Instead, a clinical examination revealed that Mrs. Crabtree had normal power

and reflexes, and no loss of neurological function. Dr. Bangura also reported that Mrs. Crabtree had normal gait and station, motor strength, sensory examination, reflexes, and fine finger manipulation, and that she did not use an assistive device all the time. Despite Mrs. Crabtree's testimony that she experienced difficulty with fine finger manipulation, the evidence contradicts this contention. Further, Dr. Hutson confirmed that her allegations of combined physical and mental disability were not supported by the objective evidence, and the vocational expert testified that based on Mrs. Crabtree's RFC, she could still perform her past work as a bookkeeper.

The ALJ also discussed the various factors found in the social security regulations which supported his credibility determination—noting that Mrs. Crabtree has a long history of pain in her back and legs which became better with the adjustment of her medications; detailing her daily activities and the difficulties she testified to having with lifting more than ten pounds and needing to move around a lot, and discussing Mrs. Crabtree's depression which limited her social contact, but did not require intense psychiatric treatment or result in a profound loss of adaptive functioning. The ALJ considered facts that exacerbated Mrs. Crabtree's ailments, and thus determined that Mrs. Crabtree was capable of performing sedentary work with explicit physical and environmental restrictions, including limited interaction with others. The ALJ's credibility determination, finding that Mrs. Crabtree's testimony was not entirely credible, was not patently wrong.

Accordingly, the ALJ's finding that Mrs. Crabtree was not disabled as defined by the Social Security Act is supported by such relevant evidence as a reasonable mind might accept as adequate to support his conclusion, and the Court will not disturb the ALJ's decision.

**CONCLUSION**

The purpose of this Court's review of the ALJ's decision is only to ensure that it is supported by substantial evidence. Therefore, given that the ALJ's decision was supported by substantial evidence, the decision of the Commissioner is **AFFIRMED.**

**SO ORDERED**.

**DATED: August 25, 2008**

_____/s/ ALLEN SHARP_____
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**
